FILED

2013 DEC 10 P 2: 03

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| CITY OF PROVIDENCE, RHODE ISLAND, on behalf of itself and all others similarly situated, | : |
|  | : Civil Action No. |
|  | : |
| Plaintiff, | : |
|  | : CLASS ACTION COMPLAINT |
| v. | : |
|  | : CA 13- 771 |
| ENDO PHARMACEUTICALS, INC., TEIKOKU PHARMA USA, INC., TEIKOKU SEIYAKU CO., LTD. ACTAVIS, INC., WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ANDA, INC., ANDA PHARMACEUTICALS, INC., and VALMED PHARMACEUTICALS, INC.; | : |
|  | : |
|  | : |
|  | : |
|  | : JURY TRIAL DEMANDED |
|  | : |
| Defendants. | : |
|  | : |
|  | : |
|  | : |

Plaintiff City of Providence, Rhode Island ("Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendants Endo Pharmaceuticals, Inc., Teikoku Pharma USA, Inc., and Teikoku Seiyaku Co., Ltd. (collectively "Endo"), and Actavis, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc. (collectively "Actavis") (all collectively "Defendants"). The following allegations are based upon the investigation of counsel and information and belief.

## I.    NATURE OF THE ACTION

1.      This antitrust class action seeks treble damages and other relief arising out of Defendants' anticompetitive scheme to unlawfully exclude generic competition from the market for Lidoderm, a brand name prescription pharmaceutical sold by Endo. Endo had U.S. Lidoderm sales of approximately $1.185 billion in 2011, $1.282 billion in 2012, and $1.4 billion through the third-quarter of 2013.

2.      Lidoderm is an amide-type local anesthetic agent and it is suggested to stabilize neuronal membranes by inhibiting the ionic fluxes required for the initiation and conduction of impulses.  In other words, it is a local anesthetic adhesive patch used to relieve the pain of post-herpetic neuralgia, also referred to as after-shingles pain.  Lidoderm is comprised of an adhesive material containing 5% lidocaine, which is applied to a non-woven polyester felt backing and covered with a polyethylene terephthalate (PET) film release liner.  The release liner is removed prior to application to the skin.  Lidoderm helps reduce sharp/burning/aching pain as well as discomfort caused by areas that are overly sensitive to touch.  It works by causing a temporary loss of feeling in the area where the patch is applied.  Lidoderm delivers a small dose of lidocaine, approximately 21 mg per patch, over a 12 hour period through the stratum corneum to damaged nerves, where it acts locally.

3.      Endo received approval to manufacture, market and sell Lidoderm in the United States from the United States Food and Drug Administration ("FDA") in 1999.  The relevant patent relating to Lidoderm was U.S. Patent No. 5,827,529 ("the '529 patent").  The '529 patent was set to expire on October 27, 2015.  Endo has been able to charge and earn monopoly prices and profits since 1999.  Endo's monopoly profits would cease once one or more lower-priced generic versions of Lidoderm entered the market, as purchasers rapidly switch from a

brand version to the generic version.   Plaintiff and the End-Payor Class were deprived the benefits of generic competition and suffered significant overcharges by Defendants' unlawful conduct.

4.      In December 2006, Endo, to protect its monopoly profits and prevent generic Lidoderm competition, filed a Citizen Petition with FDA raising questions about whether FDA's proposed approval requirements for generic Lidoderm were sufficient to determine bioequivalence.  The Citizen Petition raised a number of factors, including the appropriate safety and efficacy metrics, in establishing bioequivalence for a locally acting topical drug that produces a unique partial sensory block in patients suffering from Post Herpetic Neuralgia (PHN).  In March 2012, Endo filed a Citizen Petition highlighting the scientific and regulatory support for requiring generic manufacturers to conduct comparative clinical endpoint studies to demonstrate bioequivalence to locally acting topical products like Lidoderm.  The FDA denied Endo's Citizen Petitions concerning Lidoderm on August 22, 2012.   *See* http://www.elsevierbi.com/~/media/Supporting%20Documents/The%20Pink%

5.      Actavis sought FDA approval to launch a generic version of Lidoderm on or about November 13, 2009.  Endo immediately initiated a patent infringement suit against Actavis to protect its monopoly profits, alleging that Actavis' generic Lidoderm product infringed Endo's '529 patent.  Endo's patent infringement suit triggered a statutory automatic stay of the FDA's approval of Actavis' generic product.  Actavis' successful prosecution of the '529 patent would have enabled Actavis to introduce its lower-priced generic Lidoderm product, and also allow other generic manufacturers to potentially enter the market – creating greater competition resulting in lower prices.

6.      Recognizing the serious threat of its '529 patent being invalidated.   Endo

3

formulated an anticompetitive scheme to pay Actavis significant sums of money to abandon the patent infringement suit concerning the '529 patent and forego selling its generic version of Lidoderm.

7.     Endo effectuated this scheme on May 28, 2012 when it entered into a settlement to resolve its '529 patent infringement suit with Actavis ("Reverse Payment Agreement"). Pursuant to the Reverse Payment Agreement, Actavis agreed to abandon its challenge to the '529 patent, and not market its generic version of Lidoderm before September 15, 2013.  In return, Endo agreed to provide a wholly-owned and controlled Actavis wholesaler subsidiary with at least $96 million in free product that could increase to $240 million.  Specifically, Endo would provide $12 million, based on wholesale acquisition cost, in branded Lidoderm product, to Actavis each month from January through August of 2013.  If the FDA did not approve Watson's ANDA by December 31, 2013, Endo would provide $6.67 million in branded Lidoderm product, based on wholesale acquisition cost, to Actavis each month in 2014 that Actavis' ANDA had not received FDA approval.  If the FDA did not approve Watson's ANDA by December 31, 2014, Endo would provide $7.11 million in branded Lidoderm product, based on wholesale acquisition cost, to Actavis each month from January 2015 through September 2015 that Actavis' ANDA has not received FDA approval.

8.     Endo also agreed in the Reverse Payment Agreement not to enter the market with an authorized generic version of Lidoderm when Actavis introduced its generic Lidoderm product in September of 2013, a period of seven and one-half months after Actavis entered the market. This would give Actavis complete generic exclusivity during its 180-day generic exclusivity as the first ANDA filer.  However, during any exclusivity period Watson may have following the launch of its generic product, Actavis would pay a 25% royalty on gross profit to

Endo until another generic enters the market including any authorized generic.

9.      Zacks Investment Research, dedicated to providing professional investors with financial data and analysis, noted in a May 7, 2013 "Brokerage Research Digest" the significant importance to Endo of the Reverse Payment Agreement:

> The settlement of the Lidoderm litigation with Actavis is a major positive for Endo. Actavis will launch its generic version in 2013 despite the FDA approval of its ANDA. The company [Endo] has too few new products to help it to bridge the gap after Lidoderm generics are launched in 2013. Lidoderm accounted for 31% of Endo's total revenue in 2012.

www.zacks.com/ZER/rd_get_pdf.php?r=ENDP

10.     The Reverse Payment Agreement caused Actavis to delay marketing its generic version of Lidoderm until September 16, 2013, when Actavis finally announced it had "launched a generic version of Lidoderm (lidocaine topical patch 5%), as part of an exclusive settlement agreement with [Defendants] Endo Pharmaceuticals Inc. and Teikoku Seiyaku Co., Ltd." The division of monopoly profits between Endo and Actavis was mutually beneficial as free and unrestrained competition resulting in lower prices to consumers was foreclosed for a significant period of time.

11.     As a direct and proximate result of Defendants' unlawful conduct alleged herein, Plaintiff and members of the End-Payor Class have been injured in their business or property. Their injury consists of paying higher prices for Lidoderm than they would have paid in the absence of such violations. This injury is of the type the antitrust and consumer protection laws of the states, the District of Columbia, and Puerto Rico were designed to prevent and flows from that which makes Defendant's conduct unlawful.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the defendants.

13.     This Court also has jurisdiction over this matter pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is appropriate within this district under § 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c), because Defendants transact business within this District, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this district.

## III.     PARTIES

15.     Plaintiff City of Providence, Rhode Island ("Providence") is a municipal corporation with a principal address of 25 Donance Street, Providence, Rhode Island. Providence is a self-insured health and welfare plan, and provides reimbursement for some or all of the purchases price of prescription drugs including Lidoderm. Providence provided reimbursement for some or all of the purchase price of Lidoderm for people who reside in and/or purchased Lidoderm in Rhode Island and in other states. Providence paid more for Lidoderm than it would have absent Defendants' unlawful anticompetitive conduct to prevent generic entry and was injured as a result thereof.

16.     Defendant Endo Pharmaceuticals, Inc. is a corporation organized and existing

Under the laws of the State of Delaware, with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317. On May 23, 2012, Endo Pharmaceutical Inc.'s shareholders approved a resolution to change the company's name to Endo Health Solutions Inc. Endo Pharmaceuticals Inc. is a pharmaceutical company engaged in the research, development, sale and marketing of prescription pharmaceuticals used primarily to treat and manage pain.

18.     Defendant Teikoku Seiyaku Co., Ltd. is a Japanese corporation, with its principal place of business at 567 Sanbonmatsu Higashikagawa, Kagawa 769-2695, Japan. Teikoku Seiyaku is in the development, manufacture, and sale of medicated and medically related supplies, offering a range of hot sensation, and analgesic and anti-inflammatory plasters. Teikoku Seiyaku Co., Ltd., through its subsidiaries, also engages in the research, development, and manufacture of pharmaceutical transdermal products, and the production and sale of medical adhesive products and external aqueous gel preparations, including Lidoderm.

19.     Defendant Teikoku Pharma USA, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business at 1718 Ringwood Avenue, San Jose, California.   Teikoku Pharma USA is a wholly-owned subsidiary of Teikoku Seiyaku Co., Ltd.

20.     Defendant Actavis, Inc. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business at 400 Interplace Parkway, Parsippany, New Jersey 07054.

21.     Defendant Watson Pharmaceuticals, Inc. is a corporation organized under the laws of the State of Nevada, with its principal place of business at 400 Interplace Parkway, Parsippany, New Jersey 07054. Watson Pharmaceuticals, Inc. is now Actavis, Inc.

22.     Defendant Watson Laboratories, Inc. is a corporation organized under the laws

of the State of Nevada, with its principal place of business at 311 Bonnie Circle, Corona, California 92880. Watson Laboratories, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. (now Actavis, Inc.).

23.     Defendant Anda, Inc. is a corporation organized under the laws of the State of Florida, with its principal place of business at 2915 Weston Road, Weston, FL 33331. Anda, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. (now Actavis, Inc.).

24.     Defendant Anda Pharmaceuticals, Inc. is a corporation organized under the laws of the State of Florida, with its principal place of business at 6500 Adelaide Court, Groveport, OH  43125. Anda Pharmaceuticals, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. (now Actavis, Inc.).

25.     Defendant Valmed Pharmaceuticals, Inc. is a corporation organized under the laws of the State of New York, with its principal place of business at 300 Alt Blvd., Grand Island, New York 14072. Valmed Pharmaceuticals, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. (now Actavis, Inc.).

26.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful anticompetitive scheme and illegal restraints of trade alleged herein, and were authorized, ordered, and/or performed by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs, within the course and scope of their duties and employment, and/or with the actual or apparent authority of Defendant.

## IV.     CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on behalf of itself and, under Rules 23(a), and (b)(3) of

the Federal Rules of Civil Procedure, as representative of a Class defined as follows:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Lidoderm in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time during the period August 23, 2012, through the present and continuing until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). For purposes of the Class definition, persons or entities "purchased" Lidoderm if they paid or reimbursed some or all of the purchase price.

The following persons or entities are excluded from the proposed Class:

    a.     Defendants and their respective subsidiaries and affiliates;

    b.     All federal or state governmental entities, excluding cities, towns or municipalities with self-funded prescription drug plans;

    c.     All persons or entities who purchased Lidoderm for purposes of resale or directly from a Defendant to the extent and solely to the extent of such purpose for resale or as a direct purchase;

    d.     Insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug purchases;

    e.     Fully insured health plans, (*i.e.* plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members); and

    f.     All judges presiding in this case and all counsel of record.

28.     Members of the Class are so numerous that joinder is impracticable. Plaintiff

conservatively believes that the Class numbers in the hundreds of thousands. Further, the Class

is readily identifiable from information and records.

29.     Plaintiff's claims are typical of the members of the Class. Plaintiff and all

members of the Class were damaged by the same wrongful conduct of Defendants (*i.e.*, they

have paid artificially inflated prices for Lidoderm and were deprived of the benefits of free and

unrestrained competition from less expensive generic versions of Lidoderm as a result of Defendants' wrongful conduct).

30.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are consistent with, and not antagonistic to, those of the Class.

31.     Plaintiff is represented by counsel who is experienced and competent in the prosecution of class action antitrust litigation, particularly class action antitrust litigation in the pharmaceutical industry.

32.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.   Such generally applicable questions are inherent in Defendants' wrongful conduct.

33.     Questions of law and fact common to the Class include:

a.     whether the agreement between Defendants alleged herein constitutes a violation of the antitrust laws;

b.     whether Endo unlawfully maintained monopoly power thorough the conduct alleged herein;

c.     whether Defendants unlawfully excluded competition and potential competition from the market for Lidoderm and/or its AB generic equivalent;

d.     whether Defendants unlawfully conspired to delay or prevent generic manufacturers from entering the market for Lidoderm and/or its AB generic equivalent;

e.     whether Defendants' conduct harmed competition in the market for Lidoderm and/or its AB generic equivalent;

f.     whether Endo possessed market or monopoly power over the market for Lidoderm and/or its AB generic equivalent;

g.     whether Defendants' conduct substantially affected interstate commerce; and

        h.      whether, and to what extent, Defendants' conduct caused antitrust injury to Plaintiff and Class members, and the amount of overcharge damages to be awarded to the Class.

34.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in management of this class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.    REGULATORY FRAMEWORK

### A.    NDA Approval and the Hatch-Waxman Act

35.     Under the Federal Food, Drug, and Cosmetics Act ("FDC Act") (21 U.S.C. §§ 301-392), a manufacturer who creates a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and efficacy of the drug, as well as any information on applicable patents.

36.     Upon FDA approval of a brand-name manufacturer's NDA, it is published in the "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly referred to as the "Orange Book"). The Orange Book lists any patents (1) that the brand-name manufacturer claim for the approved drug or its approved uses; and (2) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1); 21 U.S.C. § 355(j)(7)(A)(iii).

37.     In 1984, Congress amended the FDC Act with the enactment of the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), commonly referred to as the "Hatch-Waxman Act."

38.     The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval.   The Act provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA").

39.     The ANDA relies on the scientific findings of safety and efficacy included by the brand-name drug manufacturer in the original NDA.   The ANDA filer, however, must scientifically demonstrate to the FDA that the generic drug it is going to market is just as safe and just as effective as the corresponding brand-name drug through demonstrations of bioequivalence.  A demonstration of bioequivalence means that, within certain set parameters of variability, the generic product delivers the same amount of active ingredient into the patient's blood stream for the same amount of time as the corresponding brand drug.   The range of acceptable variability afforded to generic drugs for demonstrating bioequivalence is the same lot-to-lot (i.e., batch-to-batch) range of variability afforded to brand companies when manufacturing their own brand drug.

40.     Generally speaking, ANDA filers that demonstrate bioequivalence seek to have their generic products deemed to be "AB-rated" to the corresponding brand-name drug, sometimes referred to as the "reference listed drug."  AB-rated generics are those that have been determined by the FDA to be therapeutically equivalent (i.e., bioequivalent) and pharmaceutically equivalent to their brand-name counterparts.   Pharmaceutical equivalence means the generic drug and branded reference listed drug have, among other things, the same

active ingredient, same strength, same route of administration, and same dosage form. Generic drugs that do not fulfill all of these requirements cannot be deemed to be AB-rated to the targeted reference listed drug.

41.     FDA approval of an ANDA requires a generic manufacturer's ANDA to contain one of the following four certifications: (a) the brand-name drug has no patent associated with it (a "Paragraph I certification"); (b) the brand-name drug's patents have expired (a "Paragraph II certification"); (c) the brand-name drug's patents will expire before the generic enters the market (a "Paragraph III certification"); or (d) the patent for the brand-name drug is invalid or will not be infringed by the generic product (a "Paragraph IV certification").   21 U.S.C. § 355(j)(2)(A)(vii).

42.     If a generic manufacturer files a Paragraph IV certification that the listed patent is invalid or will not be infringed, it must promptly give notice to both the NDA owner and the owner of the patent(s) at issue.  The filing of an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement.  35 U.S.C. § 271(e)(2)(A).  If the patent owner initiates an infringement action against the ANDA filer within 45 days, the FDA may not finally approve the ANDA until the earlier of either 30 months or the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.  21 U.S.C. § 355(j)(5)(B)(iii).  If, however, the patent owner fails to initiate a patent infringement action within 45 days after receiving notice of the generic manufacturer's Paragraph IV certification, then the FDA may grant final approval to the generic manufacturer's ANDA upon satisfying itself as to the safety and efficacy of the generic product.  Accordingly, the timely filing of an infringement action provides the patent owner with the equivalent of a 30-month automatic preliminary injunction.  Prompt disposition of such an action, as through a motion for summary

judgment, may mean more rapid approval for a generic manufacturer subject to such a stay.

43.     To encourage generic manufacturers to challenge branded drug patents and/or to design around them, the Hatch-Waxman Act grants the first Paragraph IV ANDA filer a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand-name drug. 21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).

44.     Typically, AB-rated generic versions of brand-name drugs are priced significantly below the brand-name counterparts.  Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions are rapidly and substantially substituted for their brand-name counterparts.  When multiple generic manufacturers enter the market, prices for generic versions of a drug predictably decrease significantly because of competition among the generic manufacturers, and because the loss of sales volume by the brand-name drug to the corresponding generics is dramatic.

45.     An AB rating is particularly significant to a generic manufacturer because, under the statutory regime enacted by Congress (*i.e.*, the Hatch-Waxman Act) and most state legislatures (i.e., Drug Product Selection laws, or "DPS laws"), pharmacists may (and, in most states, must) substitute an AB-rated generic version of a drug for the brand-name drug without seeking or obtaining permission from the prescribing doctor.  Indeed, both Congress and state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously: (a) engaging in the type of heavy promotion or "detailing" typically done by brand-name manufacturers; and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

46.     Generic competition enables end-payors to: (a) purchase generic versions of brand-name drugs at substantially lower prices; and/or (b) purchase the brand-name drug at reduced prices.   However, until generic manufacturers enter the market with an AB-rated generic, there is no bioequivalent generic drug that competes with the brand-name drug and, therefore, the brand-name manufacturer can continue to charge supra-competitive prices profitably without losing all or a substantial portion of its brand-name sales.   Consequently, brand-name drug manufacturers have a strong incentive to use various anticompetitive schemes, including the tactics alleged herein, to delay the introduction of AB-rated generic competition into the market.

**B.     AB-rated Generic Versions of Brand-Name Drugs Are Significantly Less Expensive, and Take Significant Sales Directly from the Corresponding Brand-Name Versions**

47.     Competition from lower-priced AB-rated generic drugs saves American consumers $8 to $10 billion a year.  As set forth *infra*, however, these consumer savings mean lower profits for brand drug companies.  It is well-established that when AB-rated generic entry occurs, the brand drug company suffers a rapid and steep decline in sales and profits on its reference listed drug.

48.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise).

49.     The threat of AB-rated generic competition thus creates a powerful incentive for brand companies to protect their revenue streams.  This incentive can prompt brand companies to create innovative new products or new versions of old products that offer no real medical benefits to patients.   It may also drive brand companies to seek to obstruct generic drug

competition by engineering illegal anticompetitive schemes to delay or prevent lower cost generic equivalents from entering the market, including entering into illegal agreements, as here, intended to interfere with the normal brand-to-generic competition contemplated and encouraged by the Hatch-Waxman Act and various state laws.

50.     Such tactics can be an effective, albeit anticompetitive, way to "game the regulatory structure" that governs the approval and sale of generic drugs, thereby frustrating the intention of federal and state law designed to promote and facilitate price competition in pharmaceutical markets.

## VI.     FACTUAL ALLEGATIONS

**Lidoderm Patents and FDA Approval of Lidoderm**

51.     On October 27, 1998 the PTO issued the '529 Patent,Teikoku currently holds the '529 patent, and Endo is the exclusive licensee of the '529 patent.

52.     On March 19, 1999, the FDA approved NDA No. 20-612 for Lidoderm.  The '529 patent is listed in the Orange Book for Lidoderm.

53.     On June 1, 1999, Teikoku assumed full ownership of and responsibility for the Lidoderm NDA.  It continues to hold the Lidoderm NDA, and Endo has the exclusive right to market and distribute Lidoderm in the Territory and sells the product under the authority of Teikoku's NDA.

54.     In or about November 2009, Endo also obtained an exclusive license for three additional patents, Patent No. 5,741,510 (the "'510 patent," entitled "Adhesive patch for applying analgesic medication to the skin"), Patent No. 6,096,333 (the "'333 patent," entitled "Method of forming adhesive patch for applying medication to the skin"), and Patent 6,096,334 (the "'334 patent," entitled "Adhesive patch for applying medication to the skin and method").

16

These patents (collectively, the "Rolf patents") are part of the same family and will expire on March 30, 2014. Sometime between November 2009 and June 2011, Endo acquired full title to each of the Rolf patents.

55.     Slightly less than a year later, in or about October 2010, Endo granted Teikoku a sublicense under the '510 patent to make and sell topical patches that deliver prescription pain medications and treatments containing 5% lidocaine, including Lidoderm.

56.     In late 2010, Teikoku submitted information regarding the '510 patent to the FDA for listing in the Orange Book for Lidoderm. The '510 patent is currently listed in the Orange Book with respect to Lidoderm. The remaining Rolf patents were not submitted to the FDA for inclusion in the Orange Book, and are not listed in the Orange Book with respect to Lidoderm.

**Defendants' Patent Litigation**

57.     On November 13, 2009, around the time Endo acquired an exclusive license for the Rolf patents, Actavis filed ANDA No. 20-675 with the FDA, seeking approval to market a generic equivalent of Lidoderm. Actavis's ANDA included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic Lidoderm product would not infringe any valid claim of the '529 patent. Because it was filed prior to the addition of the '510 patent to the Orange Book in 2010, its ANDA did not contain a certification as to the '510 patent. Actavis did not – and, under 21 C.F.R. § 314.94(a)(12)(vi), was not required to – file an amended Paragraph IV certification as to the '510 patent.

58.     As the first-filer of an ANDA for generic Lidoderm, Actavis was entitled to market its generic Lidoderm for 180 days free of competition from other ANDA-based, non-authorized generic equivalents of Lidoderm. Endo or its licensee, however, was permitted to sell an authorized generic version of Lidoderm during that 180-day period.

17

59.     On or about January 14, 2010, Actavis notified Teikoku that it had filed ANDA No. 20-675. On February 19, 2010, Endo sued Actavis in the United States District Court for the District of Delaware, alleging that Actavis's filing of its ANDA infringed the '529 patent. *Endo Pharms. Inc. v. Watson Labs Inc.,* No. 1:10-cv-00138-GMS (D. Del. 2010). Under 21 U.S.C. § 355(j), Endo's infringement suit triggered an automatic stay that prohibited the FDA from granting final approval to Actavis to launch a generic equivalent of Lidoderm until the earlier of: (1) a final judgment that the '529 patent was invalid, unenforceable, and/or not infringed; or (2) July 14, 2012, 30 months after the filing of Actavis's ANDA.

60.     On March 4, 2010, Actavis counterclaimed, seeking a declaratory judgment that: (1) the '529 patent was invalid; (2) Actavis's proposed generic product did not infringe the '529 patent; and (3) the '529 patent was unenforceable for inequitable conduct.

61.     On June 27, 2011, the court issued a favorable claim construction ruling on the '529 patent, essentially ruling in Endo's favor, and positioning it well for later victory in the litigation.

62.     Two days later, on June 29, 2011, Endo Pharmaceuticals, Inc. filed a patent infringement lawsuit against Actavis in the United States District Court for the District of Delaware, alleging that Actavis had infringed the Rolf patents. *Endo Pharms.Inc. v. Watson Labs Inc.,* No. 1:11-cv-00575-GMS (D. Del. 2011). Actavis counterclaimed, seeking declaratory judgments that the Rolf patents were invalid and that Actavis's proposed generic product did not infringe the Rolf patents. On information and belief, Actavis had a strong case and a high likelihood of success in the Rolf patent litigation.

63.     From February 6-14, 2012, a bench trial was held in the litigation over the '529 patent (10-cv-00138). The trial did not go well for Endo. By the end, it had become apparent

that Endo's likelihood of success was slim, due in large part to the court's June 27 claim construction ruling.

**Actavis's and Endo's Illegal Market Allocation Scheme**

64.    There are approximately 1,000,000 cases of shingles in the country annually. PHN, treatable with Lidoderm, is the most common complication of shingles, affecting roughly 13% of people over age 60 who have shingles.  PHN typically lasts for several weeks or months, but may last for years.  http://www.cdc.gov/shingles/hCitizen Petition/clinical-overview.html

65.    In 2012, Endo sold over $1.3 billion worth of Lidoderm, accounting for almost 31% of Endo Pharmaceuticals, Inc.'s sales revenue that year.   During this period, Endo possessed the market power to charge high prices on Lidoderm without losing customers, and it used its market power repeatedly, raising prices even in the face of flat costs, while simultaneously increasing its sales volume.

66.    Had Actavis succeeded in the '529 patent litigation, it would have been able to sell its lower-priced generic version of Lidoderm.  It would also have enabled competition from other generic manufacturers (including, but not limited to, a potential authorized generic sold by Endo).  Because generic versions of brand-name drugs tend to be much less expensive than their brand-name counterparts, and because purchasers usually switch quickly from a brand to a generic once the generic becomes available, Endo's monopoly profits would have quickly declined once Actavis or other lower-priced generic versions of the product entered the market.

67.    To preserve and protect its precious Lidoderm product from competition and maintain its monopoly profits derived therefrom, Endo entered into the agreement with Actavis settling the two patent cases while a decision from the court in the '529 litigation was still pending.  In exchange for substantial consideration and Endo's agreement not to launch an

authorized generic for seven and half months after Actavis entered the market (or to grant a license to anyone else to sell an authorized generic), Actavis agreed to: (a) drop its challenge to Endo's Lidoderm patents and (b) to refrain from selling a lower-priced generic equivalent of Lidoderm until September 15, 2013.

68.    Specifically regarding Actavis's agreement not to launch a lower-priced generic Lidoderm until a much later date, Sections 2(e) and 1(v) of the Agreement provide:

> Subject to Section 2(d) [Preparation For Generic Launch], Watson agrees, on behalf of itself and its Affiliates, that, prior to the Start Date, it and its Affiliates shall not directly or indirectly market, offer to sell, sell, have sold, import, manufacture or have manufactured in the Territory any of Watson's Generic Product.  Watson acknowledges and agrees that each of Endo and Teikoku would be irreparably harmed should Watson breach this Section 2(e).  Nothing in this Agreement shall prohibit or preclude Watson from exercising its rights under 35 U.S.C. § 271(e)(l).  Section 2(e).

> ***

> "Start Date" means the earliest of: (i) September 15, 2013; (ii) the date of Launch of any Generic Product other than Watson's Generic Product; or (iii) the last day before Watson would forfeit its 180-day generic drug exclusivity with respect to Watson's Generic Product due to the operation of 21 U.S.C. 355G)(5)(D)(ii) as a result of a forfeiture event under 21 U.S.C. 355(j)(5)(D)(i)(I).  Section 1(v).

69.    Endo agreed to compensate Actavis handsomely for refraining from selling a generic equivalent of Lidoderm for an agreed-upon period of time, and for dropping its challenge – which it was likely to win – to Endo's patents.  The Agreement included a "Brand Product Supply" provision, in which Endo agreed to share with Actavis the monopoly profits that Endo would reap from Lidoderm's extended market exclusivity.  Specifically, Endo agreed to provide at least $96 million worth of brand-name Lidoderm and possibly up to $240,000,000 worth of branded Lidoderm *at no cost* to Actavis for Actavis to sell.  Actavis was required to honor all Endo-price-related contracts, which effectively prevented it from selling the product at anything

below the monopoly prices set by Endo. In fact, Actavis and its Wholesaler Affiliates maintained the supra-competitive prices for branded Lidoderm throughout the term of the Agreement.

70.   The "Brand Product Supply" provision reads in relevant part:

> Endo/Teikoku shall provide, at no cost, to Watson's Wholesaler Affiliate Brand Product of value totaling twelve million dollars ($12,000,000) per month . . . on the first business day of each month beginning January 1, 2013 and ending August 1, 2013 (for a total of eight (8) months) . . . Notwithstanding the foregoing, Endo/Teikoku's obligations under this Section 3(b) shall terminate immediately upon the Launch of any Third Party Generic Product in the Territory . . . Section 3(b)

> ****

> In the event that Watson does not receive final FDA approval for Watson's Generic product by January 1, 2014, Endo/Teikoku shall provide at no cost, to Watson's Wholesaler Affiliate Brand Product of value totaling six million six hundred sixty-six thousand six hundred and sixty-seven dollars ($6,666,667), per month . . . on the first business day of each month beginning January 1, 2014 and ending on the earlier of (i) the first to occur of (x) the final approval by the FDA of Watson's Generic Product or (y) the Launch of any Generic Product by a Third Party in the Territory, or (ii) December 1, 2014 (for a total of up to twelve (12) months) . . . Section 3(c)

> ****

> In the event that Watson does not receive final FDA approval for Watson's Generic Product by January 1, 2015, Endo/Teikoku shall provide, at no cost, to Watson's Wholesaler Affiliate Brand Product of value totaling seven million one hundred eleven thousand one hundred and eleven dollars ($7,111,111) per month . . . on the first business day of each month beginning January 1, 2015 and ending on the earlier of (i) the first to occur of (x) the final approval by the FDA of Watson's Generic Product or (y) the Launch of any Generic Product by a Third Party in the Territory, or (ii) September 1, 2015 (for a total of up to nine (9) months) . . . Section 3(d).

> ****

> The Brand Product supplied by Endo/Teikoku to Watson's Wholesaler

Affiliate under Sections 3(b) through (d) may be resold solely by Watson's Wholesaler Affiliate to Third Parties for use solely in the Territory on pricing and other terms determined by Watson's Wholesaler Affiliate in its sole discretion, provided that neither Watson nor any of its Affiliates (including its Wholesaler Affiliate) shall sell, distribute or dispose of Branded Product in any manner that would constitute a Bundled Sale. Watson agrees that its Wholesaler Affiliate will honor all Endo price-related contracts as communicated to all Endo wholesalers from time to time in the ordinary course of business, provided that the price related contracts do not impose any requirements on Watson's Wholesaler Affiliate that would be inconsistent with requirements imposed upon other Lidoderm® wholesalers, and further provided that such price-related contracts shall not conflict with the terms of this Agreement. Watson shall comply with all Applicable Laws in connection with its resale of the Brand Product. Section 3(e).

71.     In addition to the significant quantities of free product that Endo agreed to give to Actavis, Endo also agreed not to launch an authorized generic version of Lidoderm (or to grant a license to anyone else to sell an authorized generic) for a period of seven and one-half months after Actavis entered the market. The practical effect of this Agreement has been to protect for a period of time Actavis's profits resulting from its so-called "first mover advantage." Actavis has taken advantage of this exclusivity period by charging higher prices than it could have if an authorized generic had been on the market. The agreement, while quite profitable for Actavis, operated to consumers' detriment by suppressing competition that would have driven down prices. The relevant sections of the Agreement read:

License. Subject to the terms and conditions of this Agreement, Endo/Teikoku hereby grant to Watson a non-exclusive (other than pursuant to Section 2(b)), royalty-bearing, non-transferable (other than pursuant to Section 21) and non- sublicensable (other than pursuant to Section 2(c)) license to the Licensed Patents to make, have made, import, use, sell, and offer for sale Watson's Generic product in the Territory solely during the License Term. Section 2(a).

\*\*\*\*

AG Product. The license granted pursuant to Section 2(a) shall be partially exclusive for a period of time in that Endo/Teikoku and their respective Affiliates shall not market or sell a Generic Product, or

22

authorize or license a Third Party to market or sell and AG Product at
any time before the earlier of (i) seven and a half (7.5) months from
the Start Date, and (ii) the Launch of any Third Party Generic Product
in the Territory. Section 2(b).

72.     Under the terms of the Agreement, Actavis agreed to share with Endo a portion

of the increased profits that would result from Endo's agreement not to launch an authorized

generic during Actavis's exclusivity period.  Actavis agreed to pay Endo a 25% royalty on

Actavis's sales of its generic during the seven-and-a-half-month exclusivity period, provided no

third-party or authorized generic was on the market.  Specifically, the Agreement provided the

following:

> Beginning with the First Commercial Sale of Watson's Generic Product
> and until the date of the occurrence of the First Commercial Sale by a
> Third Party or Endo/Teikoku or their Affiliates of a Generic Product or
> AG Product in the Territory, Watson shall pay to Endo royalty payments
> equal to twenty-five percent (25%) of all Gross Profit of Watson's
> Generic Product. . . .Section 3(a).

73.     Endo's unexplained agreement to pay $96 to $240 million, combined with its

unexplained agreement to forego its right to launch a competing authorized generic product

during the generic exclusivity period suggest that Endo had serious doubts about the patents'

validity and/or enforceability against Actavis, and that its primary goal in entering the

Agreement with Actavis was to prevent competition, thereby increasing its own profits.

74.     Actavis received final approval to launch its generic Lidoderm product on August

23, 2012.  Consistent with the Agreement, Actavis did not launch its generic product at that time,

enabling Endo to continue earning monopoly profits derived from its market exclusivity.  On

January 1, 2013, Endo began to deliver no-cost branded product to Actavis, which Actavis could

and did resell at the branded Lidoderm supra-competitive price.  When Actavis finally did launch

its AB-rated generic product in September 2013, Endo complied with the Agreement and did not

launch a competing authorized generic, which would have driven prices down. As of the date of filing of this Complaint, the Actavis product remains the only AB-rated generic equivalent to Lidoderm available. But for Defendants' illegal Agreement and ongoing, illegal, anticompetitive conduct, a less expensive generic equivalent of Lidoderm, and a less expensive authorized generic version of Lidoderm would have been available long before September 2013. By eliminating competition, Defendants have injured Plaintiff and other members of the Class causing them to pay hundreds of millions of dollars in overcharges on their purchases of Lidoderm.

## VII.   ANTICOMPETITIVE EFFECT

75.   The Reverse Payment Agreement enabled Defendants to: (a) prevent or delay the entry of less expensive generic versions of Lidoderm products in the United States; (b) fix, raise, maintain, or stabilize the price of Lidoderm products; and (c) allocate 100% of the U.S. market for Lidoderm to Endo.

76.   Actavis's ANDA was finally approved by FDA on August 23, 2012. "But for" the continuing illegal agreements between Actavis and Endo (which included financial inducements to delay the launch of less expensive generic versions of Lidoderm), Actavis would have begun selling a less expensive AB-rated generic version of Lidoderm on or after August 23, 2012. Such sales would have occurred by way of market entry by Actavis through: (a) an agreement between Endo and Actavis that did not include illegal financial inducements to delay generic entry and thus would allow for earlier market entry; (b) a victory by Actavis in the patent litigation; or (c) a launch "at risk" by Actavis upon termination of the 30-month stay, but before termination of the patent litigation. In addition, upon market entry by Actavis, Endo or its licensee would have begun selling its own less expensive authorized generic version of

Lidoderm in direct competition either directly or through a licensee. Other ANDA-based generic versions of Lidoderm would have followed into the market approximately 180 days after the launch by Actavis.

77.     Defendants' unlawful concerted action has delayed or prevented the sale of generic Lidoderm in the United States, and unlawfully enabled Endo to sell Lidoderm at artificially inflated, supra-competitive prices. "But for" Defendants' illegal, ongoing conduct, generic competition to Lidoderm would have occurred already because one or more of the generic companies would have already entered with its generic version of Lidoderm, and/or a Endo licensee would have launched an authorized generic product contemporaneously with the first generic launch.

## VIII.   <u>EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE</u>

78.     At all material times, Endo manufactured, marketed, promoted, distributed, and sold substantial amounts of Lidoderm in a continuous and uninterrupted flow of commerce across state lines and throughout the United States and abroad.

79.     At all material times, Defendants transmitted funds, as well as contracts, invoices and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Lidoderm and/or AB-rated bioequivalents.

80.     In furtherance of their efforts to monopolize and restrain competition in the market for Lidoderm and its generic equivalents, Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel. Defendants' activities were within the flow of and have substantially affected interstate commerce.

81.     Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, retailers within each state are foreclosed from offering less expensive generic Lidoderm to end-payors inside each respective state.  The foreclosure of generic Lidoderm directly impacts and disrupts commerce for end-payors within each state by forcing them to buy the branded product at the higher price.

## IX.     MARKET POWER AND MARKET DEFINITION

82.     At all relevant times, Endo had substantial market power (*i.e.*, monopoly power) with respect to Lidoderm because it had the power to maintain the price of the drug it sold as Lidoderm at supra-competitive levels without losing so many sales as to make the supra-competitive price unprofitable.

83.     A small, but significant, non-transitory price increase above the competitive level for Lidoderm by Endo would not have caused a loss of sales sufficient to make the price increase unprofitable.

84.     At competitive price levels, Lidoderm does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Lidoderm.

85.     The differing efficacy, safety, and side effect profiles of different treatments play a critical role in doctors' selection of the most appropriate treatment for a particular patient.  There are no interchangeable drug products that are available to prescribing physicians for the indications for Lidoderm.  The FDA does not consider such products to be bioequivalent or substitutes.

86.     Endo needed to control only Lidoderm and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lidoderm profitably at supra-competitive

prices. Only the market entry of a competing, AB-rated generic version of Lidoderm would render Endo unable to profitably maintain supra-competitive prices for Lidoderm.

87. Defendants had, and exercised, the power to exclude and restrict competition to Lidoderm and AB-rated bioequivalents.

88. Endo, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant product market as a result of patent and other regulatory protections and high cost of entry and expansion.

89. To the extent that Plaintiff is legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, Plaintiff alleges that the relevant market is the market for Lidoderm (i.e., Lidoderm and its AB-rated generic equivalents). During the period relevant to this case, Endo has been able to profitably maintain the price of Lidoderm well above competitive levels.

90. The relevant geographic market is the United States and its territories. At all relevant times prior to generic entry, Endo's market share in the relevant market was 100%.

## X.   ANTITRUST IMPACT

91. During the relevant period, Plaintiff and/or members of the Class purchased substantial amounts of branded Lidoderm indirectly from Endo. As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for Lidoderm. Those prices were substantially greater than those that members of the Class would have paid absent the illegal conduct alleged herein.

92. As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount

and forms and components of such damages will be calculated after discovery and upon proof at trial.

93.     General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for Lidoderm results in higher prices at every level below. Herbert Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE p. 624 (1994).  Professor Herbert Hovenkamp goes on to state that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top."  He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

94.     Defendants' anticompetitive conduct enabled them to indirectly charge consumers and third-party payors prices in excess of what Defendants otherwise would have been able to charge absent Defendants' anticompetitive conduct.

95.     The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

96.     The inflated prices the Class paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

## XI.     CLAIMS FOR RELIEF

### COUNT ONE: CONTRACT, COMBINATION OR CONSPIRACY
### IN RESTRAINT OF TRADE UNDER STATE LAW
### (Against all Defendants)

97.     Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

98.     By engaging in the anticompetitive conduct alleged herein, Defendants have intentionally and unlawfully engaged in one or more contracts, combinations and/or conspiracies in restraint of trade in violation of the following state laws:

a.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Arizona by members of the Class.

b.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in California by members of the Class.

c.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-4503, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in the District of Columbia by members of the Class.

d.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Florida by members of the Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Hawaii Code §480, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Hawaii by members of the Class.

f.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Iowa Code § 553, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Iowa by members of the Class.

g.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Kansas by members of the Class.

h.      Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Me. Rev.

Stat. Ann. tit. 10, §§ 1101, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in Maine by members of the Class.

i.     Defendant have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in Massachusetts by members of the Class.

j.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in Michigan by members of the Class.

k.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in Minnesota by members of the Class.

l.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in Mississippi by members of the Class.

m.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Neb. Rev. Stat. Ann. §§ 59-801, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in Nebraska by members of the Class.

n.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in Nevada by members of the Class, in that thousands of sales of Lidoderm and/or its AB generic equivalent took place at Nevada pharmacies, purchased by Nevada end-payors at supra-competitive prices caused by Defendants' conduct.

o.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in New Mexico by members of the Class.

p.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in New York by members of the Class.

q.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Carolina by members of the Class.

r.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Dakota by members of the Class.

s.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Lidoderm and/or its AB generic equivalent in Puerto Rico by members of the Class.

t.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Rhode Island by members of the Class.

u.     Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in South Dakota by members of the Class.

v.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Lidoderm and/or its AB generic equivalent at Tennessee pharmacies.

w.     Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Utah by members of the Class.

x.     Defendants have intentionally and unlawfully engaged in a contract, combination orconspiracy in restraint of trade in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Vermont by members of the Class.

y.   Defendants have intentionally and unlawfully engaged in a contract, combination or conspiracy in restraint of trade in violation of W. Va. Code §§ 47-18-1, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in West Virginia by members of the Class.

z.   Defendants have intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq*., with respect to purchases of Lidoderm and/or its AB generic equivalent in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Lidoderm and/or its AB generic equivalent at Wisconsin pharmacies.

99.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members were deprived of the opportunity to purchase a less expensive generic version of Lidoderm earlier and were forced to pay higher prices.  This injury is of the type the antitrust and consumer protection laws of the above states, the District of Columbia and the territories were designed to prevent and flows from that which makes Defendant's conduct unlawful.

## COUNT TWO: CONSPIRACY TO MONOPOLIZE UNDER STATE LAW
### (Against all Defendants)

100.   Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

101.   At all relevant times, Endo possessed monopoly power in the relevant market.

102.   Endo entered into an illegal agreement (Reverse Payment Agreement) with Actavis, as part of an overall scheme, to settle a patent infringement suit in order to maintain its monopoly power in the market for Lidoderm as described herein.

103.   The goal, purpose and effect of the illegal agreement was for Endo to maintain and extend its monopoly power in the Lidoderm market.

104.   Plaintiff and members of the Class indirectly purchased substantial amounts of Lidoderm from Endo.

105.   With timely competitive market entry by manufacturers of generic Lidoderm, Plaintiff and members of the Class would have substituted lower-priced generic Lidoderm for the higher priced branded version for some or all of their Lidoderm requirements, and/or would have paid lower net prices on their remaining purchases.

106.   Defendants each committed at least one overt act in furtherance of the conspiracy.

107.   As a result of Defendants' illegal concerted conduct, Plaintiff and members of the Class were forced to pay, and did pay, more than they would have paid for Lidoderm.

108.   By engaging in the foregoing misconduct, Endo has violated the following state antitrust laws:

a.   Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Ariz. Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Arizona by members of the Class.

b.   Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in California by members of the Class.

c.   Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in the District of Columbia by members of the Class.

d.   Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Florida by members of the Class.

e.   Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Haw. Rev. Stat. §§ 480, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Hawaii by members of the Class.

f.   Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Iowa Code §§ 553, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Iowa by members of the Class.

g.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Kansas by members of the Class.

h.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1102, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Maine by members of the Class.

i.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Mass. Ann. Laws ch. 93A, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Massachusetts by members of the Class.

j.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Michigan by members of the Class.

k.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Minn. Stat. §§ 325D.52, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Minnesota by members of the Class.

l.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Mississippi by members of the Class.

m.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Neb. Rev. Stat. Ann. §§ 59-802, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Nebraska by members of the Class.

n.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Nevada by members of the Class.

o.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.H. Rev. Stat. Ann. §§ 356, 356:2, 356:3, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New Hampshire by members of the Class.

p.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent

in New Mexico by members of the Class.

q.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New York by members of the Class.

r.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Carolina by members of the Class.

s.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Dakota by members of the Class.

t.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Rhode Island by members of the Class.

u.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in South Dakota by members of the Class.

v.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Tennessee by members of the Class.

w.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Utah Code Ann. §§ 76-10-1301, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Utah by members of the Class.

x.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Vermont by members of the Class.

y.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of W. Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in West Virginia by members of the Class.

z.     Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Wisconsin by members of the Class.

As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members were deprived of the opportunity to purchase a less expensive generic version of Lidoderm earlier and were forced to pay higher prices.  This injury is of the type the antitrust and consumer protection laws of the above States, the District of Columbia and the territories were designed to prevent and flows from that which makes Defendant's conduct unlawful.

### COUNT THREE: MONOPOLIZATION UNDER STATE LAW
### (Against All Endo Defendants)

109.    Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

110.    At all relevant times, Endo possessed monopoly power in the relevant market.

111.    Endo entered into an illegal agreement (Reverse Payment Agreement) with Actavis, as part of an overall scheme, to settle a patent infringement suit in order to maintain its monopoly power in the market for Lidoderm and/or its AB generic equivalent as described herein.

112.    The goal, purpose and effect of the illegal agreement was for Endo to maintain and extend its monopoly power in Lidoderm and/or its AB generic equivalent market.

113.    Plaintiff and members of the Class indirectly purchased substantial amounts of Lidoderm from Endo.

114.    As a result of Defendants' illegal conduct, Plaintiff and members of the Class were forced to pay, and did pay, more than they would have paid for Lidoderm and/or its AB generic equivalent.

115.    Had manufacturers of generic Lidoderm entered the market and lawfully competed in a timely fashion, Plaintiff and members of the Class would have substituted lower-priced generic Lidoderm for the higher priced branded version for some or all of their Lidoderm requirements, and/or would have paid lower net prices on their remaining Lidoderm purchases.

116.    By engaging in the foregoing misconduct, Endo has violated the following state antitrust laws:

a.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Ariz. Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Arizona by members of the Class.

b.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in California by members of the Class.

c.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in the District of Columbia by members of the Class.

d.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Florida by members of the Class.

e.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Haw. Rev. Stat. §§ 480, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Hawaii by members of the Class.

f.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Iowa Code §§ 553, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Iowa by members of the Class.

g.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Kansas by members of the Class.

h.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. tit.10, §§ 1102, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Maine by members of the Class.

i.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Mass. Ann. Laws ch. 93A, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Massachusetts by members of the Class.

j.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Michigan by members of the Class.

k.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Minnesota by members of the Class.

l.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Mississippi by members of the Class.

m.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Mo. Rev. Stat. §§ 416.011, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Missouri by members of the Class.

n.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Neb. Rev. Stat. Ann. §§ 59-802, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Nebraska by members of the Class.

o.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Nevada by members of the Class.

p.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.H. Rev. Stat. Ann. §§ 356, 356:2, 356:3, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New Hampshire by members of the Class.

q.  Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New

Mexico by members of the Class.

r.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New York by members of the Class.

s.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Carolina by members of the Class.

t.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Dakota by members of the Class.

u.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Rhode Island by members of the Purchaser Class.

v.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in South Dakota by members of the Class.

w.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25- 101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Tennessee by members of the Class.

x.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-1301, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Utah by members of the Class.

y.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Vermont by members of the Class.

z.   Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in West Virginia by members of the Class.

aa.   Endo has intentionally and unlawfully maintained its monopoly power in the

relevant market in violation of Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Wisconsin by members of the Class.

bb. Endo has intentionally and unlawfully maintained its monopoly power in the relevant market in violation of the Puerto Rico Antitrust Act 10 L.P.R.A. 263, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Puerto Rico by members of the Class.

117.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members were deprived of the opportunity to purchase a less expensive generic version of Lidoderm and were forced to pay higher prices.  This injury is of the type the antitrust and consumer protection laws of the above States, the District of Columbia and the territories were designed to prevent and flows from that which makes Defendant's conduct unlawful.

## COUNT FOUR: CONSUMER PROTECTIONUNFAIR AND UNCONSCIONABLE TRADE PRACTICES UNDER STATE LAW
### (Against all Defendants)

118.    Plaintiff repeats and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

119.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive acts or practices in violation of the state consumer protection statutes listed below.

120.    There was a gross disparity between the price that Plaintiff and the Class members paid for the brand product and the value received, given that a less expensive substitute generic product should have been available.

121.    As a direct and proximate result of Defendants' unfair or unconscionable trade practices in violation of the state consumer protection statutes listed below, Plaintiff and Class members were deprived of the opportunity to purchase a less expensive generic version of Lidoderm and forced to pay higher prices.

122.    By engaging in the foregoing conduct, Defendants have violated the following

state unfair and deceptive trade practices and consumer fraud laws:

a.    Defendants have engaged in unfair or deceptive acts or practices in violation of Alabama Stat. §8-19-1 *et.*

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522, *et seq.*

b.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

c.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code §§ 28-3901, *et seq.*

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*

e.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §§ 480, *et seq.*

f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code section § 714.16, *et seq.*

g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code Ann. §§ 48-601, *et seq.*

h.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*

i.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. Ann. §§ 50-623, *et seq.*

j.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Me. Rev. Stat. tit. 5 §§ 207, *et seq.*

k.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, *et seq.*

l.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901, *et seq.*

m.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 8.31, *et seq.*

n.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

o.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code Ann. §§ 30-14-101, *et seq.*

p.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.*

q.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq.*

r.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*

s.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.*

t.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq.*

u.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq.*

v.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code §§ 51-15-01, *et seq.*

w.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

x.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq.*

y.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq.*

z.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq.*

aa.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*

bb.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code §§ 46A-6-101, *et seq.*

123.   Plaintiff and the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable or deceptive acts alleged herein. Their

injury consists of paying higher prices for Lidoderm than they would have paid in the absence of such violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## COUNT FIVE: UNJUST ENRICHMENT
### (Against All Defendants)

124.    Plaintiff repeats and realleges all preceding paragraphs in this Complaint herein.

125.    Defendants have benefited from the monopoly profits on the sale of Lidoderm resulting from the unlawful and inequitable acts alleged in this Complaint.

126.    Defendants' financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Lidoderm by Plaintiff and members of the End-Payor Class.

127.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

128.    It would be futile for Plaintiff and the Class to seek a remedy from any party with whom they had privity of contract.

129.    It would be futile for Plaintiff and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it indirectly purchased Lidoderm, as they are not liable and would not compensate Plaintiff for unlawful conduct caused by Defendants.

130.    The economic benefit of overcharges and unlawful monopoly profits derived by Defendants through charging supra-competitive and artificially inflated prices for Lidoderm is a direct and proximate result of Defendants' unlawful practices.

131.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Defendants.

132.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states, except for Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for Lidoderm derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this complaint.

133.    Defendants are aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

134.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

135.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

136.    Plaintiff and the Class have no adequate remedy at law.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully prays that:

A.      The Court determine that this action may be maintained as a class action pursuant to Rule 23(a), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Procedure, be given to the Class, and declare the Plaintiff as the representative of the Class;

B.      The acts alleged herein be adjudged and decreed to be in violation of state antitrust, consumer protection, and unjust enrichment laws as alleged herein;

C.      Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

D.      Award the Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial;

E.      Award Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a construction trust to remedy Defendants' unjust enrichment;

F.      Award Plaintiff and the Class damages as permitted by law, including disgorgement;

G.      Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Such other and further relief as the Court may deem just and proper.

### XIII.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issuesso triable.

Dated: December 10, 2013

BY MOTLEY RICE LLC
ITS ATTORNEYS

By                              
Donald A. Migliori

321 South Main Street, 2nd Floor
Providence, Rhode Island 02903
Telephone: (401) 457-7700
Facsimile: (401) 457-7708
dmigliori@motleyrice.com

Michael M. Buchman
John A. Ioannou
MOTLEY RICE LLC
600 Third Ave, Suite 2101
New York, New York 10016
Telephone: (212) 577-0051
Facsimile: (212) 577-0054
mbuchman@motleyrice.com
jioannou@motleyrice.com

Meghan S. B. Oliver
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, South Carolina 29464
Telephone (843) 216-9000
Facsimile (843) 2169450
moliver@motleyrice.com